IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

FEDERAL INSURANCE COMPANY, §
§
Plaintiff, §
§ Civil Action No. 3:11-CV-2661-D
VS. §
§
THE HANOVER INSURANCE §
COMPANY, §
§
Defendant. §

MEMORANDUM OPINION
AND ORDER

The instant cross-motions for summary judgment in this insurance coverage litigation present questions regarding the duties to defend and indemnify, including policy and endorsement interpretation questions and whether the court can consider extrinsic evidence under a narrow exception to the Texas eight-corners rule. For the following reasons, the court grants in part and denies in part plaintiff's motion for partial summary judgment and denies defendant's motion.

I

This is an action by plaintiff Federal Insurance Company ("Federal") against defendant The Hanover Lloyds Insurance Company ("Hanover"). The parties dispute whether Hanover was obligated to defend and indemnify Heritage Buckingham Place SPE LP ("Heritage Buckingham") and Heritage Property Investment Trust, Inc. ("Heritage

Property") (collectively, "Heritage" or "the Heritage Entities")[1] in a lawsuit brought by Edwin Parker ("Parker"), individually and on behalf of the Estate of Rachel Parker (the "*Parker* suit"). The *Parker* suit arises from an incident (a murder) that occurred at the Buckingham Place Shopping Center ("Shopping Center"), which Heritage allegedly acquired by purchase from Buckingham Shopping Center, Ltd. ("Buckingham"). Hanover insured Talley Rents, LLC ("Talley"), a tenant at the Shopping Center. Federal assumed Heritage's defense of the *Parker* suit under an insurance policy issued to Heritage's parent company.

In 2001 Talley entered into an agreement ("Lease") with Buckingham to lease retail space (the "Talley Unit") at the Shopping Center.[2] The Lease defined Buckingham as the "Landlord" and required Talley to procure and maintain liability insurance insuring "both Landlord and Tenant against all claims, demands or actions arising out of or in connection with Tenant's use or occupancy of the Demised Premises."[3] P. Nov. 21, 2012 App. 10.[4]

---

[1]For simplicity, and because the parties do so in their briefs, the court will primarily refer collectively to Heritage Buckingham and Heritage Property as "Heritage." Where a distinction between the two entities is important, the court will refer to each entity separately and will refer to them collectively as "the Heritage Entities."

[2]Because both parties move for summary judgment, the court will recount the evidence that is undisputed and, if it is necessary to set out evidence that is contested, will do so favorably to the party who is the summary judgment nonmovant in the context of that evidence. *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. Oct. 25, 2010) (Fitzwater, C.J.) (citing *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

[3]Section 15.2 of the Lease provides:

> Tenant shall procure and maintain throughout the term [of] this lease a policy or policies of insurance, at its sole cost and expense, causing Tenant's fixtures and contents to be insured

Talley obtained from Hanover a policy of insurance ("Hanover Policy") that contained a

"Businessowners Liability Special Broadening Endorsement" ("Endorsement").   The

Endorsement provides, in relevant part:

> 1.  Additional Insured by Contract, Agreement or Permit
>     Under Section II - Liability C.   Who Is An Insured,
>     Paragraph 5. is added as follows:
>     5.   Any person or organization with whom you agreed,
>          because of a written contract, written agreement or
>          permit to provide insurance, is an insured, but only with
>          respect to: . . .
>     b.   Facilities owned or used by you.

*Id.* at 249 (bold font omitted).   The Endorsement specifically excludes "Managers or lessors

of premises if . . . [t]he occurrence takes place after you cease to be a tenant in that

premises."  *Id.* at 250.

In 2003 Buckingham sold the Shopping Center to Heritage.   Although Heritage was

not added as a party to the Lease, Talley paid rent to Heritage and, according to Federal,

"operated under the Lease with Heritage as landlord."  P. Nov. 21, 2012 Br. 8.   The Lease

was scheduled to expire on November 30, 2006.   At some point before November 24, 2006,

---

> under standard fire and extended coverage insurance and with
> regard to liability insurance, insuring both Landlord and Tenant
> against all claims, demands or actions arising out of or in
> connection with Tenant's use or occupancy of the Demised
> Premises, or by the condition of the Demised Premises.

P. Nov. 21, 2012 App. 10.

    [4]Because the parties have filed cross-motions, the court for clarity will cite the briefs
and appendixes by the date filed.

Talley moved out (allegedly violating the Lease), leaving the Talley Unit vacant.

ACE Cash Express, Inc. ("ACE") operated a store ("ACE Store") adjacent to one side of the Talley Unit.  On the night before November 24, 2006, one or more persons broke into the space adjacent to the other side of the now-vacant Talley Unit.  After knocking an entry hole through the wall separating that space from the Talley Unit, they entered the Talley Unit and cut an entry hole through the wall separating the Talley Unit from the ACE Store.  The intruders then departed for several hours, returning very early the next morning.  Using the holes they had made, they re-entered the ACE Store by entering the space adjacent to the Talley Unit, traversing the Talley Unit, and entering the ACE Store.  The intruders then hid in a bathroom waiting for an employee of the ACE Store to arrive.  When ACE employee Rachel Parker ("Rachel") arrived that morning, she was confronted by an armed assailant who demanded that she open the safe.  Rachel could not access the money, and the assailant fatally shot her.

In 2008 Parker, individually and on behalf of the Estate of Rachel Parker, filed the *Parker* suit against ACE and Heritage.  Parker asserted various claims, including that ACE and Heritage were independently negligent for failing to provide adequate security at the ACE Store and the Shopping Center.  Although Talley was at one point added as a defendant, Parker later omitted Talley from the lawsuit.

Federal alleges that it made several demands on Talley and Hanover for defense and indemnity, but Hanover declined coverage under the Hanover Policy.  Federal ultimately settled the *Parker* suit on behalf of Heritage for $100,000.  Federal then filed this lawsuit

- 4 -

seeking a declaratory judgment that Hanover owed Heritage a defense and indemnity for the claims that Parker asserted against Heritage in the *Parker* suit, that Hanover breached the Hanover Policy by denying a defense and indemnity, and that Federal is entitled to damages in the amount of its share of the costs incurred to defend and settle the claims in the *Parker* suit. Federal also asserts a claim for contractual and/or equitable subrogation, seeking to enforce Heritage's right to recover for Hanover's failure to provide it a defense and indemnity. Alternatively, Federal seeks contribution from Hanover.

Hanover moves for summary judgment, contending that it had no duty to defend or indemnify Heritage because the Hanover Policy did not cover Heritage for the *Parker* suit. Concerning contractual subrogation, Hanover contends that Federal has not properly pleaded a contractual subrogation claim against Hanover and that there is no coverage for such a claim. As to equitable subrogation, Hanover moves for summary judgment on the grounds that there is no coverage, Hanover is not primarily liable, and Federal paid the debt voluntarily.

Federal moves for partial summary judgment, contending, *inter alia*, that Hanover had a duty under the Hanover Policy to defend and indemnify Heritage with respect to the *Parker* suit.

## II

When a party moves for summary judgment on a claim on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the

opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the opposing party must go beyond its pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if the opposing party fails to meet this burden. *Little*, 37 F.3d at 1076.

When a party moves for summary judgment on a claim on which it will have the burden of proof at trial, the party "must establish 'beyond peradventure all of the essential elements of the claim[.]'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). This means that the moving party must demonstrate that there are no genuine and material fact disputes and that the party is entitled to summary judgment as a matter of law. *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

III

Before considering both parties' summary judgment motions, the court must decide whether under Texas law it can consider extrinsic evidence when determining whether Hanover had a duty to defend Heritage in the *Parker* suit.[5]

A

Texas follows the eight-corners rule to determine whether an insurer owes a duty to defend. *See, e.g.*, *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006).

> Under the eight-corners rule, two documents determine an insurer's duty to defend—the insurance policy and the third-party plaintiff's pleadings in the underlying litigation. If the underlying pleadings allege facts that may fall within the scope of coverage, the insurer has a duty to defend; if the pleading only alleges facts excluded by the policy, there is no duty to defend.

*ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 840 (5th Cir. 2012) (citations, brackets, and internal quotation marks omitted). "Resort to evidence outside the four corners of these two documents is generally prohibited." *Id.* (quoting *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 253 (5th Cir. 2011)); *see also GuideOne*, 197 S.W.3d at 308-09. The Supreme Court of Texas "has never recognized any exception to the

---

[5]"The duty to indemnify, on the other hand, is a matter dependent on the facts and circumstances of the alleged injury-causing event, and parties may introduce evidence during coverage litigation to establish or refute the duty to indemnify." *ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832, 840 (5th Cir. 2012) (quoting *Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 594 (5th Cir. 2011)) (internal quotation marks and brackets omitted).

strict eight corners rule." *ACE Am. Ins.*, 699 F.3d at 840 (quoting *Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 597 (5th Cir. 2011)). But "a few Texas appellate courts have held that the examination of extrinsic evidence was warranted under an exception to the eight-corners rule." *Id.* (collecting cases).

> The exception to this rule is limited to cases where it is initially impossible to discern whether coverage is potentially implicated *and* when the extrinsic evidence goes solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case.

*Id.* (quoting *Ooida Risk Retention Grp., Inc. v. Williams*, 579 F.3d 469, 475 (5th Cir. 2009)) (internal quotation marks omitted). In *ACE American Insurance* the Fifth Circuit applied the exception and considered extrinsic evidence when deciding whether a party seeking a defense and indemnity in a state court proceeding was an additional insured. The court then turned to the question whether, under the eight-corners rule, there was a duty to defend.

> This court's holding in *Gilbane* requires that our analysis begin with a determination of whether Freeport qualifies as an "additional insured" under Brand Energy's insurance policy, which includes a review of the 2009 purchase agreement. If we determine that Freeport qualifies as an additional insured during the relevant time period, our analysis will then proceed to the eight-corners rule to decide if the facts alleged in the underlying state court proceedings were sufficient to trigger ACE's duty to defend Freeport as an additional insured under Brand Energy's insurance policy.

*Id.* at 840-41 (citations omitted).

B

Most of the evidence that bears on whether Heritage qualifies as an additional insured within the Endorsement fits within the narrow exception to the eight-corners rule because the facts "go[] solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case." *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 531 (5th Cir. 2004).  It goes to a fundamental issue of coverage because the Endorsement defines additional insured as a "person or organization with whom [Talley] agreed, because of a written contract, written agreement or permit to provide insurance."  P. Nov. 21, 2012 App. 249.  The court cannot determine whether Hanover owed Heritage a duty to defend without first determining whether Heritage was covered under the Hanover Policy.  This issue does not overlap with the merits of or engage the truth or falsity of any facts alleged in the *Parker* suit.

The question whether Talley was still a "tenant" at the time of Rachel's murder also requires that the court consider extrinsic evidence consisting of the Lease and facts that bear upon when the Lease expired.  This evidence falls within the narrow exception to the eight-corners rule.  This evidence goes solely to a fundamental issue of coverage that does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case.

Other questions—including whether Talley was "using" the Talley Unit on November 24, 2006 and whether the incident occurred "with respect to" a facility used by Talley—do not require that the court consider extrinsic evidence.  Rather, these questions can be decided

solely by reference to the Hanover Policy and Endorsement and the petition in the *Parker* suit.  Accordingly, the court will follow the eight-corners rule when addressing the parties' arguments on these issues.

IV

The court now turns to the parties' motions, considering first whether either Heritage Buckingham or Heritage Property qualifies as an additional insured under the Hanover Policy.

A

As already noted, the Endorsement extends coverage under the Hanover Policy to any "person or organization with whom [Talley] agreed, because of a written contract, written agreement or permit to provide insurance." P. Nov. 21, 2012 App. 249.  Hanover argues that, because the Lease was entered into between Talley and Buckingham, required Talley to procure and maintain liability insurance insuring "Landlord," and defined "Landlord" as Buckingham rather than either of the Heritage Entities, Federal cannot prove that either Heritage Buckingham or Heritage Property is a party with whom Talley agreed "because of a written contract, written agreement or permit to provide insurance." *Id.*

In response, and in its own summary judgment motion, Federal maintains that, when Heritage Buckingham and Heritage Property purchased the Shopping Center from Buckingham, both Heritage Entities assumed all of Buckingham's debt and became the successors in interest to Buckingham's rights as "Landlord" under the Lease.  Federal contends that, because the Lease specifically contemplates a successor-in-interest

replacement for the defined "Landlord," and because the Heritage Entities qualified as successors in interest, the Heritage Entities stepped into the shoes of Buckingham, thereby obligating Talley under the Lease to provide insurance to them as the "Landlord."

Hanover replies that, even if Heritage *Buckingham* is a successor in interest as the purchaser of the Shopping Center, Heritage *Property* is only the property manager, and therefore is not the "Landlord" under the Lease.

B

Under the Lease, Talley agreed to procure and maintain liability insurance, insuring "both Landlord and Tenant against all claims, demands or actions arising out of or in connection with Tenant's use or occupancy of the Demised Premises."  P. Nov. 21, 2012 App. 10.   Although Buckingham was the defined "Landlord" at the time Talley and Buckingham entered into the Lease, the Lease specifically contemplated that its terms would apply to and be binding on successors in interest.   According to § 28.13, "[t]he terms, provisions and covenants contained in this lease shall apply to, inure to the benefit of and be binding upon the parties hereto and their respective heirs, *successors in interest* and legal representatives except as otherwise herein expressly provided." *Id.* at 18 (emphasis added). Accordingly, Talley agreed under the Lease to provide liability insurance not only to Buckingham, as Landlord, but also to Buckingham's successors in interest.

Under Texas law, "[a] successor in interest is one who follows another in ownership or control of property, retaining the same rights as the original owner, with no change in substance." *Steger v. Muenster Drilling Co.*, 134 S.W.3d 359, 370 n.19 (Tex. App. 2003,

pet. denied) (citing Black's Law Dictionary 1446); *see also Odessa Tex. Sheriff's Posse, Inc. v. Ector Cnty.*, 215 S.W.3d 458, 467 (Tex. App. 2006, pet. denied) ("[A] successor in interest is one who follows another in ownership or control of property and . . . acquires the rights and liabilities of another by amalgamation, consolidation, or duly authorized succession."). Federal argues that because the Heritage Entities purchased the Shopping Center, assumed all of Buckingham's debt, and subsequently operated the shopping center in the position of a landlord, they qualify as "successors in interest" under the Lease.  Hanover does not appear to dispute that Heritage *Buckingham* purchased the Shopping Center from Buckingham and that Heritage *Buckingham* thus became a successor in interest under the Lease.  And Federal cites evidence that "Heritage" purchased the Shopping Center from Trademark Property Company.  Federal also relies on evidence that, in executing the "Assumption and Release Agreement," Buckingham transferred ownership of the Shopping Center to Heritage *Buckingham.  See* P. Dec. 21, 2012 App. 261, ¶ C ("Noteholder . . . has been asked to consent to the transfer of the Premises to [Heritage Buckingham].").  Federal posits that, through the "Assumption and Release Agreement," Heritage *Buckingham* stepped into the shoes of Buckingham and, by operation of § 28.13 of the Lease, replaced Buckingham as "Landlord." The court agrees and holds that Federal has established beyond peradventure that Heritage *Buckingham* is Buckingham's successor in interest under the Lease.  The court therefore concludes as a matter of law that Talley agreed under the Lease to provide liability insurance to Heritage *Buckingham*.

As to Heritage *Property*, Federal has failed to produce sufficient evidence for a

reasonable jury to find that Heritage *Property* is a successor in interest to Buckingham under the Lease.  Hanover disputes that Heritage *Property* became the owner of the Shopping Center.  It maintains that Heritage *Property* was merely a property manager who did not succeed Buckingham as "Landlord."   In support of its motion, Federal relies on the "Assumption and Release Agreement" to argue that both Heritage Entities "purchased the Shopping Center from Buckingham."  P. Nov. 21, 2012 Br. 18.  But this document does not itself transfer any ownership rights to Heritage *Property*.  It merely states that Heritage *Property* is "assum[ing] . . . the obligations of [Buckingham]."  *Id.*  P. Dec. 21, 2012 App. 261.  Assumption of Buckingham's debt is insufficient, without more, to establish successor-in-interest status.  *See, e.g.*, *Odessa Tex. Sheriff's Posse*, 215 S.W.3d at 467 (holding that successor-in-interest status was not established where there was no evidence of formal transfer or assignment of lease from one corporation to another, even though there was evidence that second corporation's members understood that they were stepping into the shoes of the prior organization, that they were assuming its debts and assets, including lease, and that county treated them as if they were successors in interest).  And Federal has produced no other evidence that would permit the court to conclude as a matter of law, or enable a reasonable jury to find as a matter of fact, that Heritage *Property* assumed Buckingham's rights under the Lease and thereby qualified as a successor in interest.

## C

Federal argues in the alternative that, even if Heritage does not qualify as a successor in interest, the doctrine of quasi-estoppel mandates that Heritage was landlord on the date of

the incident.  Because the court has just held that Heritage *Buckingham* was a successor in interest under the Lease, it will consider Federal's alternative quasi-estoppel argument with respect to Heritage *Property*.

The doctrine of "[q]uasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) (citing *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App. 1994, writ denied)).  "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Id.* (citing *Atkinson Gas*, 878 S.W.2d at 240; *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 765-66 (Tex. App. 1992, writ denied)).  Federal argues that Talley cannot take full advantage of the benefits yielded by the Lease for the entire five-year term, only to have Hanover now assert that Talley was never bound under the Lease during the period between Heritage's acquisition of the Shopping Center in 2003 and the Lease expiration date of November 30, 2006, on the basis that Heritage was not named as "Landlord" in that document.

The court holds that a reasonable jury could find that Talley treated Heritage Property as its landlord under the Lease.  Federal cites evidence that, in 2006, Talley received two letters imprinted on letterhead of "Heritage Property Investment Trust, Inc." requesting payment of Talley's share of the 2005 annual tax expenses and indicating that these expenses had been paid.  It also points to sworn affidavit testimony that "[Talley] signed a lease with *Heritage Properties*" and that "a representative of [Talley] met with a representative of

- 14 -

*Heritage Properties* and relinquished the keys to the lease[d] space." P. Nov. 21, 2012 App. 689-90 (emphasis added). This evidence would permit a reasonable jury to find that Talley treated Heritage Property as its landlord under the Lease.

Although this evidence is sufficient to avoid summary judgment dismissing Federal's alternative theory of quasi-estoppel, it does not establish beyond peradventure that Talley treated Heritage Property as its landlord and, therefore, that Federal is entitled to summary judgment based on quasi-estoppel. For example, the letters requesting payment of annual tax expenses, although printed on Heritage Property letterhead, request that payment be remitted to "Heritage Buckingham Place SPE Limited Partnership." And the sworn statements refer to "Heritage Properties," but they do not purport to distinguish between "Heritage," generally, and "Heritage Property Investment Trust," and thus do not establish beyond peradventure that Talley treated Heritage *Property*, as opposed to Heritage *Buckingham*, as the landlord under the Lease.

The court therefore denies Federal's motion for summary judgment establishing that Heritage *Property* is an additional insured under the Endorsement. Federal has not established beyond peradventure its alternative theory of quasi-estoppel.[6] But because

---

[6]In response to Hanover's motion, Federal also argues that the Hanover Policy does not require that Heritage actually be a party to the Lease to qualify as an additional insured. Federal posits that it is enough that Talley obtained the Hanover Policy "because of" the Lease. The court disagrees. As explained above, the Endorsement extends coverage to any "person or organization with whom [Talley] *agreed*, because of a written contract, written agreement or permit to provide insurance." P. Nov. 21, 2012 App. 249 (emphasis added). Even if Talley obtained the Hanover Policy "because of" the Lease, Federal has not established that Talley "agreed, because of a written contract, written agreement or permit"

Federal has raised a genuine issue of material fact on this issue, the court also denies Hanover's motion for summary judgment establishing that Heritage Property is not an additional insured under the Endorsement.

V

Hanover moves for summary judgment dismissing Federal's claims on the ground that the Endorsement excludes coverage if the occurrence takes place after Talley ceased to be a tenant in the premises. Hanover argues that, prior to Rachel's murder, Talley made Heritage aware of its plan to vacate the premises, moved out, directed that the power be disconnected, and turned over the keys to Heritage. Federal responds that Texas law defines "tenant" as a person or entity under lease, and that Talley was therefore a "tenant" through the expiration of the Lease on November 30, 2006.

The Endorsement does not apply "[t]o any . . . Managers or lessors of premises if . . . [t]he occurrence takes place after you cease to be a tenant in that premises." P. Nov. 21, 2012 App. 250. Accordingly, if Talley was not a tenant on November 24, 2006, the Endorsement does not cover Heritage as an additional insured. Hanover appears to argue that Talley was not a "tenant" because it had vacated the premises. Yet Hanover does not dispute that the Lease did not expire until November 30, 2006. Nor does Hanover dispute that the Lease specifically prohibited Talley from vacating the Talley Unit prior to that date, and that, on receiving notice that Talley was vacating, Hanover sent Talley a "do not close" notice and

to provide insurance to *Heritage Property*.

- 16 -

refused to accept surrender of the property.  The court concludes as a matter of law that these undisputed facts establish that Talley was still a tenant on November 24, 2006.  Accordingly, Hanover is not entitled to summary judgment on the ground that Talley was not a tenant on the date of Rachel's murder.

## VI

The court next considers whether, under the eight-corners rule, either party is entitled to summary judgment on the question whether Hanover owed Heritage a duty to defend in the *Parker* suit.

## A

Because Federal is asserting that Hanover had a duty to defend Heritage in the *Parker* suit, Federal "has the burden of establishing coverage under the terms of the policy." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). "[T]he petition's allegations and the policy's language determine the insurer's duty to defend." *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997); *see also Rhodes v. Chi. Ins. Co.*, 719 F.2d 116, 119 (5th Cir. 1983) (Texas law) ("Under Texas law, the insurer's duty to defend is determined solely from the face of the pleadings and without reference to facts outside of the pleadings."). "[T]his complaint-allegation rule gives rise to a duty to defend if one or more of the plaintiff's claims, if taken as true, are sufficient to state a cause of action coming within the terms of the policy." *Rhodes*, 719 F.2d at 119 (internal quotation marks, citation, and ellipses omitted).

"When applying the eight corners rule, [the court] give[s] the allegations in the

petition a liberal interpretation." *Nat'l Union Fire Ins. Co. of Pitt. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997) (per curiam). If the facts alleged in the pleadings would give rise to any claim within the policy's coverage, the insurer is obligated to defend the suit against the insured. *Gen. Star Indem. Co. v. Gulf Coast Marine Assocs., Inc.*, 252 S.W.3d 450, 454 (Tex. App. 2008, pet. denied) (citation omitted). But if the petition does not allege facts within the scope of coverage, the insurer is not obligated to defend the suit. *Id.* (citation omitted).

> Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. Stated differently, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor.

*Nat'l Union Fire Ins.*, 939 S.W.2d at 141 (quoting *Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.*, 387 S.W.2d 22, 26 (Tex. 1965)). The court will not, however, "read facts into the petition, nor will [the court] look outside of the petition or imagine factual scenarios that might trigger coverage." *Gen. Star*, 252 S.W.3d at 454-55 (citation omitted). "The duty to defend does not depend upon what the facts actually are or on what the parties believe them to be but rather upon what the plaintiff alleges them to be." *Hodges v. Allstate Ins. Co.*, 1996 WL 33650193, at *2 (Tex. App. 1996, no writ) (not designated for publication). And "[i]f an insurer has a duty to defend its insured against any portion of the underlying suit, then the insurer is required to defend the entire suit." *Gen. Star*, 252 S.W.3d at 455 (citation omitted).

- 18 -

The court must look to all of the pleadings in a case to determine whether the duty to defend was breached at any time after the claim was tendered.  *See, e.g.*, *Rhodes*, 719 F.2d at 119.

The eight-corners rule is also followed when determining whether an allegation falls within a policy exclusion.  *Calderon v. Mid-Century Ins. Co. of Tex.*, 1998 WL 898471, at *2 (Tex. App. 1998, pet. denied) (not designated for publication).  The court is to "compare the allegations in the petition filed against the insured with the coverage afforded by the insurance policy."  *Gen. Star*, 252 S.W.3d at 454.  If the "petition only alleges facts excluded by the policy, the insurer is not required to defend."  *Fid. & Guar. Ins. Underwriters, Inc. v. McManus*, 633 S.W.2d 787, 788 (Tex. 1982); *see also Holmes v. Emp'rs Cas. Co.*, 699 S.W.2d 339, 340-41 (Tex. App. 1985, writ ref'd n.r.e.) ("The insurer may rely on the allegations of the petition, and if the plaintiff alleges facts that, prima facie, exclude the plaintiff from the liability coverage, the insurer has no duty to defend.").

B

The Endorsement covers any organization with whom Talley agreed to provide insurance, but "only with respect to . . . Facilities owned or used by [Talley]."  P. Nov. 21, 2012 App. 249.  Hanover moves for summary judgment on Federal's duty to defend claim, contending that, even if Heritage otherwise was an additional insured under the Endorsement, it was not covered with respect to the *Parker* suit.  Hanover maintains that the murder could not have occurred "with respect to" facilities "owned or used" by Talley because the *Parker* petition alleges that Talley had vacated the premises prior to the date of the incident.

In response to Hanover's motion, and in its own summary judgment motion, Federal

argues that Talley was still "using" the Talley Unit on the date of the incident because the Lease did not expire until November 30, 2006 and was thus still in effect on November 24, 2006.[7]  Federal maintains that Talley was still a tenant and had the right to occupy and use the premises as it saw fit, and therefore was "using" the unit even though it had vacated the premises.  Federal also relies on § 9.1 of the Lease, which provides: "Tenant shall not at any time leave the Demised Premises vacant, but shall in good faith continuously throughout the term of this lease conduct and carry on in the entire Demised Premises the type of business for which the Demised Premises is leased."  P. Nov. 21, 2012 App. 7.  Federal argues that this provision unequivocally barred Talley from leaving the Talley Unit vacant.  It argues that Talley breached the Lease by vacating the premises early, and it posits that Talley's breach of one provision of the Lease could not release it from the obligations stemming from other Lease provisions, such as the insurance and indemnity clauses.  Finally, Federal contends that it is clear that Heritage did not accept Talley's early vacation of the Talley Unit, as is evidenced, *inter alia*, by a "do not close" letter that Heritage sent to Talley.  Federal therefore maintains that the Lease remained binding on both parties until its expiration date and Talley was "using" the Talley Unit on the date of the incident, despite having vacated the premises before the date Rachel was murdered.

---

[7]To support its argument, Federal relies on extrinsic evidence in addition to the Hanover Policy and the *Parker* petition.  Although the court recounts this evidence in explaining Federal's arguments, it has not considered extrinsic evidence in deciding whether either party is entitled to summary judgment in this respect.

C

"Interpretation of insurance contracts in Texas is governed by the same rules as interpretation of other contracts." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994).[8]   When a "contract is worded so that it can be given a definite meaning, it is unambiguous and a judge must construe it as a matter of law." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 291 (5th Cir. 2005) (Texas law); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991).   "In applying these rules, a court's primary concern is to ascertain the parties' intent as expressed in the language of the policy." *Int'l Ins.*, 426 F.3d at 291; *see also Forbau*, 876 S.W.2d at 133 ("[T]he court's primary concern is to give effect to the written expression of the parties' intent."). The court must give effect to all of a policy's provisions so that none is rendered meaningless. *Int'l Ins.*, 426 F.3d at 291.

"If an insurance contract uses unambiguous language, [the court] must enforce it as written.  If, however, a contract is susceptible to more than one reasonable interpretation, [the court] will resolve any ambiguity in favor of coverage."  *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008) (footnotes omitted); *see also Nat'l Union*, 811 S.W.2d at 555.  "Whether an insurance contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Int'l Ins.*, 426 F.3d at 291 (citing *Kelley-Coppedge,*

---

[8]It is undisputed that Texas law is controlling.

*Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)).

The Endorsement extends insurance coverage to any person or organization with whom Talley contracted to provide insurance, "but only with respect to . . . Facilities owned or used by [Talley]." P. Nov. 21, 2012 App. 249. Neither Hanover nor Federal appears to dispute that, before Talley vacated the premises, the Talley Unit constituted a facility "used by" Talley. But the language of the Endorsement does not unambiguously resolve whether to "use" a facility means the same thing as to "occupy" a facility. One reasonable interpretation of the Endorsement is that "use" means occupancy, i.e., active use of the premises. But another reasonable interpretation is that use means a facility that Talley has the right to use, even if it is not actively using it. Because the Endorsement covers facilities that Talley owns or uses, the reference to use may simply be intended to make clear that it cover facilities that Talley has a right to use (such as under a lease), even though it does not own them. Because the Endorsement is ambiguous in this respect, the court must resolve the ambiguity in favor of coverage. *Don's Bldg. Supply*, 267 S.W.3d at 23; *Nat'l Union*, 811 S.W.2d at 555.[9]

Moreover, the *Parker* petition alleges not only that Talley "had the right to occupy the retail space located next door to the ACE Store," but that "Talley occupied" that space. P.

---

[9]Hanover argues incorrectly that, because Federal failed to plead ambiguity, it cannot obtain summary judgment on this ground. Under Texas law, "[t]he interpretation of the contract and determination of ambiguity . . . is a matter of law, and the court 'may conclude that a contract is ambiguous even in the absence of such a pleading by either party.'" *In re Newell Indus., Inc.*, 336 F.3d 446, 449 n.5 (5th Cir. 2003) (quoting *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993)).

Nov. 21, 2012 App. 796.  The *Parker* petition also asserts that "Talley owned, *operated*,

*managed*, and/or *controlled* the abandoned retail space next door to the ACE Store under a

lease it entered into with the Landlord Defendants," and that although it "had recently closed

and ceased operations at the . . . store that it operated there and removed all contents in said

space, [it had done so] in violation of its lease with the Landlord Defendants."  *Id.* at 797.

Liberally interpreted, the allegations that Talley "operated," "managed," and/or "controlled,"

the leased premises, and that Talley's closure and cessation of store operations had been done

in violation of the lease, support the conclusion that Talley was "using" the Talley Unit even

after it vacated the premises.  Accordingly, because ambiguities in the Endorsement must be

resolved in favor of coverage, and because, under the eight-corners rule, "[w]here the

complaint does not state facts sufficient to clearly bring the case within or without the

coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a

case under the complaint within the coverage of the policy," *National Union Fire Insurance*,

939 S.W.2d at 141 (citation omitted), the court holds that the *Parker* petition effectively

alleges that, on November 24, 2006, the Talley Unit was a facility "used by" Talley, within

the meaning of the Endorsement.

## VII

### A

Hanover contends next that, because the incident occurred inside the ACE Store, not

in the Talley Unit, Talley was not "using" the space at the time of the murder.  It relies on

Texas and other cases to argue that there is no duty to defend when a party is injured outside

the boundaries of the leased premises.  Hanover maintains that, because the Endorsement provides coverage "only with respect to . . . Facilities owned or used by [Talley]," P. Nov. 21, 2012 App. 249, and because Rachel was murdered in the ACE Store, not the Talley Unit, there is no coverage under the Endorsement.

Federal responds that the plain meaning of the phrase "with respect to" in the Endorsement is that there is coverage for incidents "logically and causally relate[d] to the premises used by Talley."  P. Dec. 21, 2012 Br. 18 (emphasis omitted).  It argues that the vacant Talley Unit played an instrumental role in the incident and that there is an absolute relation and causal connection between the vacancy of the Talley Unit and the *Parker* suit. According to Federal, "[b]ut for Talley's vacant unit, the crime that led to [Rachel's] death may never have occurred."  *Id.*

B

In arguing that the additional insured language of the Endorsement limits coverage to incidents that occur wholly within the leased premises, Hanover is conflating the additional insured provision of the Endorsement with the Hanover Policy's provisions regarding liability insurance coverage.  When the Endorsement states that additional insureds include any person or organization with whom Talley agreed to provide insurance—"but only with respect to . . . facilities owned or used by [Talley]"—it is addressing *who* is covered as an additional insured.  In other words, to be an additional insured, the insured must be (1) a person or organization, (2) with whom Talley agreed to provide insurance because of a written contract, written agreement or permit, and (3) the insurance must be with

respect to a facility owned or used by Talley.  This provision does not control the scope of

liability insurance coverage under the Hanover Policy.  The scope of liability coverage

provided to Talley and an additional insured is prescribed by the "Coverages" section, which

provides:

> a.  [Hanover] will pay those sums that the insured becomes
> legally obligated to pay as damages because of 'bodily injury,'
> property damage' or personal and advertising injury to which
> this insurance applies.
> b.  This insurance applies:
>> (1) To "bodily injury" and "property damage"
>> only if:
>> (a) the "bodily injury" or "property damage" is
>> caused by an "occurrence" that takes place in the
>> "coverage territory"
>> (b) the "bodily injury" or "property damage"
>> occurs during the policy period; and
>> (c) Prior to the policy period, no insured . . . knew
>> that the "bodily injury" or "property damage" had
>> occurred, in whole or in part. . . .

P. Nov. 21, 2012 App. 229.  The Policy defines "coverage territory" to include "The United

States of America."  *Id.* at 242.  Hanover provides no basis to conclude that the murder that

occurred inside the ACE Store does not fall within the "coverage territory."

Hanover does maintain that "[t]he primary purpose of the . . . Endorsement in the

landlord-tenant context is to provide 'additional insured' coverage to the landlord for

accidents involving persons connected to the tenant and that occur within the leased premises

as a result of the tenant's actions."  D. Jan. 11, 2013 Reply Br. 11.  But this argument is not

supported by the language of the Endorsement, and, as already noted, it conflates the

Endorsement's attempt to define who is an additional insured within the scope of liability

- 25 -

coverage found in the "Coverages" section.   Nor does Hanover adequately explain why, when the Hanover Policy and Endorsement are read as a whole and all parts are harmonized, the court can only conclude that coverage is limited to incidents involving persons connected to the tenant and that occur within the leased premises.   As stated above, the insurance must be with respect to a facility owned or used by Talley, not the occurrence that caused "bodily injury."

Hanover's reliance on *Triton Development Corp. v. Commerce Industry Insurance Co.*, 1999 WL 293877 (N.D. Tex. May 4, 1999) (Stickney, J.), is misplaced.   In that case, the court interpreted an additional insured policy as not extending coverage when the accident did not occur within the boundaries of the leased premises.   In *Triton* the additional insured endorsement stated:

> WHO IS INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule *but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you* and shown in the Schedule and subject to the following additional exclusions.

*Id.* at *4 (emphasis added).   The plaintiff in the underlying suit alleged that he was injured at a location "some distance outside and beyond the gate to the Leased Premises."   *Id.* at *6. Judge Stickney concluded that the injury did not arise out of the ownership, maintenance, or use of the premises because

> there is no causal connection between the Leased Premises and the slippery area on the ground where Stoglin's injury allegedly occurred.   There is no allegation that the loose gravel on which Stoglin slipped originated on the Leased Premises, was caused

> by the Leased Premises, was connected to work done on the
> Leased Premises, or had any other connection with the Leased
> Premises.  Moreover, there are no allegations that, had EPIC
> acted differently in its use of the premises, the dangerous
> condition would not have existed.

*Id.*  Unlike *Triton*, however, in this case the petition in the *Parker* suit alleged, *inter alia*, that

"Talley knew of the vacancy of the spaces next door to the ACE Store and that such vacancy

substantially increased the danger of robbery resulting in a lethal confrontation for an ACE

employee," and that Talley's failure to provide adequate security in the Talley Unit "was a

proximate cause of the occurrence in question."  P. Nov. 21, 2012 App. 798.

Nor does *University of Houston v. Sterling Bank*, 963 S.W.2d 93 (Tex. App. 1997, pet.

denied), support the conclusion that, for there to be coverage under the Endorsement, the

injury must occur within the leased premises.  In *Sterling Bank* a Texas court held that a

bank's liability carrier did not owe a duty to defend when a bank employee slipped and fell

outside of the bank's premises.  *Id.* at 95.  Although the bank was required to obtain

additional insured insurance to cover the University of Houston, it had failed to do so.

Accordingly, the court did not interpret any policy language in reaching its decision, but

instead relied on general premises liability principles.  *Id.*  Moreover, there was no allegation

that the bank had any causal connection to the slip-and-fall injury that the plaintiff in the

underlying suit sustained.[10]

---

[10]To the extent Hanover relies on cases from outside Texas, they are not binding
precedent.  Nor are they persuasive authority because none contains facts similar to those
alleged in this case and none interprets a policy with materially similar language.

Hanover has not established as a matter of law that the Hanover Policy does not cover occurrences outside the boundaries of the leased premises. Accordingly, Hanover's motion for summary judgment is in this respect denied.

## VIII

Federal moves for summary judgment on the question whether Hanover owed Heritage a duty to defend the *Parker* suit, arguing that under the eight-corners rule, Hanover's duty to defend was triggered.

## A

Federal relies on the "Coverages" provision of the Hanover Policy, contending that Hanover agreed to defend Heritage, as an additional insured, for any suit seeking damages for bodily injury and that the *Parker* suit is such a suit because it is a civil proceeding in which damages for "bodily injury" (Rachel's murder) were alleged. Federal maintains that the remaining three requirements of the Hanover Policy are met by the allegations and facts contained in Parker's pleadings:

> (1) the bodily injury (*i.e.*, Rachel Parker's murder) caused by an occurrence (simply defined as an "accident" in the Hanover Policy, and the Incident was an accident, in relation to the claims asserted against Heritage) within the coverage territory (defined by the Hanover Policy as "the United States of America"); (2) occurred during the policy period (a fact stipulated by Hanover); and (3) neither Heritage [n]or Talley, as insureds, knew or could have known about the bodily injury (*i.e.*, the murder) prior to the policy period, as the Incident occurred squarely within the coverage period.

P. Nov. 21, 2012 Br. 38.

- 28 -

Hanover responds that it had no duty to defend because Heritage did not qualify as an additional insured under the Endorsement, reiterating its argument that the allegations in the *Parker* suit establish that Heritage did not qualify as an additional insured because "a party cannot be 'using' when the incident took place off the leased premises."  D. Dec. 21, 2012 Br. 17.

B

As explained above, although Heritage's status as an additional insured is determined under the Endorsement, liability insurance coverage for an additional insured is determined under the "Coverages" section of the Hanover Policy.  The court has already determined that Heritage *Buckingham* qualifies as an additional insured under the Endorsement, and that there is a genuine issue of material fact regarding whether Heritage *Property* qualifies as a successor in interest (and thus as an additional insured) based on quasi-estoppel.  Regarding coverage, under the eight-corners rule, if the facts alleged in the *Parker* suit pleadings would give rise to any claim within the policy's coverage, the insurer is obligated to defend the suit against the insured.  *See, e.g., Gen. Star*, 252 S.W.3d at 454 (citation omitted).  And "in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor."  *Nat'l Union Fire Ins.*, 939 S.W.2d at 141 (quoting *Heyden Newport,* 387 S.W.2d at 26).  Hanover does not dispute that the Heritage Entities meet all of the requirements stated in the "Coverages" section of the Hanover Policy.  Accordingly, the court holds that Federal has established beyond

- 29 -

peradventure that, under the eight-corners rule, to the extent the Heritage Entities qualify as additional insureds under the Endorsement, Hanover owed them a duty to defend in the *Parker* suit.

## C

Hanover argues that no duty to defend arises until a petition alleging a potentially covered claim is tendered to the insurer and that Heritage did not initially request a defense from Hanover until May 3, 2010.  It thus posits that an obligation to defend Heritage ran only from May 3, 2010 until October 15, 2010, the date on which Talley was no longer a party to the *Parker* suit.  In response, Federal disputes that Heritage's initial request for defense and indemnity was dated May 3, 2010, and it asserts that Federal made numerous requests for defense and indemnity from Talley and its insurer well before May 3, 2010.  Federal does not respond to the argument in detail or with evidence, however, because it contends this issue relates to damages, "and the parties have agreed to present damage issues via a separate motion if necessary."  P. Dec. 21, 2012 Br. 25.  Hanover does not address Federal's argument in its reply brief.  The court therefore concludes that this issue is one to be addressed separately, if necessary.[11]

## IX

Federal also seeks summary judgment on the question whether the facts in the *Parker* suit establish that Hanover had a duty to indemnify Heritage.

---

[11]Assuming this issue cannot be resolved by agreement, it must be decided at trial or (assuming leave to file additional summary judgment motions is granted) on motion.

A

Under the Hanover Policy, Hanover agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies." P. Nov. 21, 2012 App. 229. Federal argues that the facts established in the *Parker* suit triggered Hanover's duty to indemnify. It posits that the *Parker* suit established that Rachel's bodily injury was caused by an "occurrence" that took place in the United States of America, that the "bodily injury" took place during the coverage period, and that neither Heritage nor any of its employees knew or could have known about the incident prior to the coverage period.

In response, Hanover reiterates its argument that the murder could not have occurred "with respect to" facilities owned or used by Talley because, at the time of the murder, Talley had already vacated the leased premises. Hanover maintains that, because the murder did not occur on the Talley premises, itself, Hanover has no duty to indemnify Federal for any settlement payment made on behalf of Heritage. Finally, Hanover argues that "Federal has not established that any settlement paid was reasonable nor paid by Federal voluntarily." D. Dec. 21, 2012 Br. 19.

B

Under Texas law, "[w]hile the duty to defend is based solely on examining the eight corners of the operative complaint and the insurance policy, the duty to indemnify is controlled by 'the facts actually established in the underlying suit.'" *Basic Energy Servs., LP v. Great N. Ins. Co.*, 347 Fed. Appx. 83, 87 (5th Cir. 2009) (per curiam) (quoting *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins.*

*Co.*, 279 S.W.3d 650, 656 (Tex. 2009)).   Thus "the duty to indemnify only arises after an insured has been adjudicated, whether by judgment or settlement, to be legally responsible for damages in a lawsuit." *Collier v. Allstate Cnty. Mut. Ins. Co.*, 64 S.W.3d 54, 62 (Tex. App. 2001, no pet.).

Because Federal is moving for summary judgment on this issue, it must establish beyond peradventure its entitlement to indemnity.   In its response to Hanover's summary judgment motion, Federal argues that "in the context of equitable subrogation, Texas courts have been liberal in their determinations that payments were made involuntarily," and it asserts that "an excess insurer's payment to settle a suit against the insured has been said to be presumptively involuntary for subrogation purposes," and that "[a]n insurer who pays a third-party claim against its insured is not a volunteer if the payment is made in good faith and under a reasonable belief that the payment is necessary to its protection."   P. Dec. 21, 2012 Br. 24 n.12.   Although the case law concerning involuntary payments appears to support Federal's position, Federal must also establish beyond peradventure that the amount paid to settle the *Parker* suit was reasonable.   Federal must therefore "prov[e] conclusively that its settlement[] . . . w[as] made in good faith, upon a reasonable basis, and for a reasonable amount." *U.S. Fire Ins. Co. v. Scottsdale Ins. Co*., 264 S.W.3d 160, 178-79 (Tex. App. 2008, no pet.) (collecting cases); *see H.S.M. Acquisitions, Inc. v. West*, 917 S.W.2d 872, 879 (Tex. App. 1996, pet. denied) ("For a settling indemnitee to recover an amount of the settlement from its indemnitor, the indemnitee must show its potential liability to a claimant and that the settlement was reasonable, prudent, and made in good faith under the

circumstances." (citing *Fireman's Fund Ins. Co. v. Commercial Standard Ins. Co.*, 490 S.W.2d 818, 824 (Tex. 1972); *Getty Oil Corp. v. Duncan*, 721 S.W.2d 475, 477 (Tex. App. 1986, writ ref'd n.r.e.))).  Federal has not attempted to meet this burden, perhaps because it considers the issue of damages to be reserved for separate consideration.  *See* P. Dec. 21, 2012 Br. 25 ("the parties have agreed to present damage issues via a separate motion if necessary").

Accordingly, although the court's holdings above regarding Hanover's duty to defend apply equally to Hanover's duty to indemnify, Federal has not met its additional obligations to establish beyond peradventure all the required elements of the duty to indemnify.  The court therefore denies Federal's summary judgment motion as to Hanover's duty to indemnify Federal.

X

Federal contends that, even if the court determines Heritage is not an additional insured under the Hanover Policy, Hanover still had a duty and obligation to defend and indemnify Heritage under the "Coverage Extension Supplementary Payments" provision of the Hanover Policy ("Supplementary Payments Provision").

A

The Supplementary Payments Provision states:

> (2) If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:
> (a) The "suit" against the indemnitee seeks damages for which the insured has assumed the

- 33 -

liability of the indemnitee in a contract or agreement that is an "insured contract";

(b) This insurance applies to such liability assumed by the insured;

(c) The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

(d) The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interest of the insured and the interests of the indemnitee;

(e) The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

(f) The indemnitee

(i) Agrees in writing to:

    (1) Cooperate with us in the investigation, settlement or defense of the "suit";

    (2) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

    (3) Notify any other insurer whose coverage is available to the indemnitee; and

    (4) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(ii) Provides us with written authorization to:

    (1) Obtain records and other information related to the "suit"; and

    (2) Conduct and control the defense of the indemnitee in such "suit".

P. Nov. 21, 2012 App. 230.[12]  Federal argues the Lease constitutes an "insured contract" and that the *Parker* suit sought damages for negligence and intentional tort in connection with the Talley Unit and Talley's early vacation of those premises, thus squarely falling within Talley's Lease obligation to insure Heritage "'against all claims, demands or actions arising out of or in connection with Tenant's use or occupancy of the [Talley Unit], or by the condition of the [Talley Unit].'"  P. Nov. 21, 2012 Br. 44 (quoting P. Nov. 21, 2012 App. 10) (brackets in original).  Federal also maintains that Talley assumed an obligation to defend Heritage in the provision of the Lease in which Talley assumed an obligation to indemnify Heritage for any loss, expense, or claim "caused by the negligence or misconduct of Tenant . . . or arising out of any breach or default by Tenant in the performance of its obligations under this lease." P. Nov. 21, 2012 App. 10.  Federal argues that no conflict of interest exists and that Heritage promptly requested a defense, but because the demand was ignored, no opportunity arose for Heritage or Talley to request or provide written authorization of any kind to facilitate the defense of the suit.  Thus Federal maintains all of the requirements of the indemnitee provisions of the Hanover Policy were met and that Heritage is therefore entitled to "necessary litigation expenses" incurred in the *Parker* suit.  P. Nov. 21, 2012 Br. 45.

Hanover responds that, because Federal did not plead this provision of the Hanover Policy, it cannot rely on it in its summary judgment motion; that the Supplementary

---

[12]The Hanover Policy defines "insured contract" as "[a] contract for a lease of premises."  P. Nov. 21, 2012 App. 242.

Payments Provision only applies where the insured would be obligated under the insuring agreement to pay the indemnitee's cost of defense, and Federal has not established that Talley is obligated under the Lease to pay Heritage's cost of defense; that the indemnity provision in the Lease is not valid and enforceable because it does not meet either Texas' fair notice requirement or express negligence doctrine; and that the Supplementary Payments Provision is not satisfied because a conflict of interest existed between Talley and Heritage since Heritage initially brought Talley into the *Parker* suit on a third-party action seeking contribution and indemnity under the Lease and alleging a breach of the Lease provision requiring Talley to have the Landlord as an additional insured under its policy.

Federal argues in reply that it did plead a claim for relief under this section of the Hanover Policy by using language broad enough to encompass all applicable portions of the Hanover Policy.  Federal does not respond to Hanover's fair notice or express negligence doctrine arguments.

                                              B

By its terms, the Supplementary Payments Provision requires the defense of an indemnitee only if, *inter alia*, "[t]he 'suit' against the indemnitee seeks damages for which the insured [i.e., Talley] has assumed the liability of the indemnitee [i.e., Heritage] in a contract or agreement that is an 'insured contract' [here, the Lease]."  P. Nov. 21, 2012 App. 230 (bracketed material added).  Thus for this provision to apply, Talley would have to have agreed in the Lease to assume liability for Heritage's own negligence and intentional torts, because the *Parker* suit sought damages from Heritage based on Heritage's own conduct.

                                           - 36 -

Because an agreement purporting to indemnify a party for the party's own negligence "is an extraordinary shifting of risk," the Supreme Court of Texas has developed fair notice requirements, including the express negligence doctrine and the conspicuousness requirement, which apply to these types of agreements. *See Dresser Indus., Inc. v. Page Petroleum, Inc*., 853 S.W.2d 505, 508 (Tex. 1993) (citations omitted). "The express negligence doctrine states that a party seeking indemnity from the consequences of that party's own negligence must express that intent in specific terms within the four corners of the contract." *Id.* (citing *Enserch Corp. v. Parker*, 794 S.W.2d 2, 8 (Tex. 1990); *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 707-08 (Tex. 1987)). "The conspicuous requirement mandates 'that something must appear on the face of the [contract] to attract the attention of a reasonable person when he looks at it.'" *Id.* (quoting *Ling & Co. v. Trinity Sav. & Loan Ass'n*, 482 S.W.2d 841, 843 (Tex. 1972)) (brackets in original).

Federal does not point to any provision in the Lease in which Talley expressly agreed to indemnify Heritage for Heritage's own negligence or intentionally tortious acts. Nor has Federal established that such a provision would meet the fair notice requirements under Texas law. Moreover, Federal has failed to establish beyond peradventure that there was no conflict of interest between Heritage and Talley, as required by the Supplementary Payments Provision. It argues that "Parker's claims against Talley and Heritage mirrored each other, therefore the pleadings placed Talley and Heritage in direct alignment of interests," yet it fails to address whether the negligence of either Talley or Heritage would absolve the other of liability such that a conflict might exist. P. Nov. 21, 2012 Br. 44-45. Finally, Federal

argues that it is excused from satisfying the written agreement and written authorization provisions because "the demand was ignored for several months then utterly denied, [so] no opportunity arose for Heritage or Talley to request or provide written authorization," *id.* at 45, yet it provides no basis to support such a conclusion under the heavy beyond peradventure standard.

Because Federal has failed to establish beyond peradventure that it satisfied all of the requirements of the Supplementary Payments Provision, it is not entitled to summary judgment that Hanover had a duty to defend and indemnify Heritage under this provision.

XI

Hanover moves for summary judgment on Federal's equitable and contractual subrogation claims.[13]  Concerning contractual subrogation, Hanover contends that Federal has not properly pleaded a contractual subrogation claim against Hanover and that there is no coverage for such a claim.  As to equitable subrogation, Hanover moves for summary

---

[13]Under Texas law,

> [t]here are two types of subrogation.  Contractual (or conventional) subrogation is created by an agreement or contract that grants the right to pursue reimbursement from a third party in exchange for payment of a loss, while equitable (or legal) subrogation does not depend on contract but arises in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter.

*Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007) (citations omitted).

judgment on the grounds that there is no coverage, Hanover is not primarily liable, and Federal paid the debt voluntarily.

Although the court disagrees with Federal that Hanover has not addressed this issue in its brief, the court declines to grant summary judgment on this basis because in neither its opening brief nor in its reply brief has Hanover established that Federal has not properly pleaded a contractual subrogation claim in its complaint.[14]   And for the reasons explained above, Hanover is not entitled to summary judgment on the basis that there is no coverage; to the contrary, Federal is entitled to partial summary judgment holding that there is coverage.

As for equitable subrogation, in Hanover's reply brief, it narrows this argument to the contention that Federal has no right to equitable subrogation because there is no coverage. *See* D. Jan. 11, 2013 Reply Br. 6 ("As to equitable subrogation, without coverage, Federal is not entitled to such recovery.") & 14 ("As to equitable subrogation, Federal is not entitled

---

[14]Federal alleges in its complaint:

> Federal is equitably and contractually subrogated to the rights of Heritage for the defense costs and settlement amount paid in the Parker lawsuit.  Federal therefore seeks to enforce Heritage's right to recover for Hanover's failure to provide it a defense and indemnity in the Parker lawsuit.  Federal is entitled to recover under contractual and/or equitable subrogation Hanover's share of the defense costs and all or part of the settlement amount.

Compl. ¶ 5.2.  Hanover did not move to dismiss this claim under Fed. R. Civ. P. 12(b)(6) as inadequately pleaded.  And it has not demonstrated under the summary judgment standard that it is entitled to summary judgment on this basis.

to subrogation, and is not entitled to such recovery.").  Because the court has already concluded that Hanover is not entitled to summary judgment on the basis that there is no coverage, and that Federal is in part entitled to recover, it denies the motion on this ground as well.

*   *   *

For the foregoing reasons, the court grants in part and denies in part Federal's motion for partial summary judgment and denies Hanover's motion for summary judgment.

**SO ORDERED.**

September 24, 2013.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE